**RECEIVED**

JUN 0 6 2018

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| Wendy M Dale,<br>        Plaintiff,<br>    vs.<br>Red Hat, Inc. and Leah Moore, in<br>both her individual capacity and<br>as an agent of Red Hat, Inc.,<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE #  5:18-CV-262-BO<br><br>COMPLAINT<br>FOR DISCRIMINATION ON THE BASIS OF<br>DISABILITY UNDER THE ADA<br>AND LIBEL |

## PARTIES

1. Plaintiff is a resident of Wake County, North Carolina.

2. Defendant Corporation, Red Hat, Inc., is a Delaware corporation with its headquarters at 100 East Davie Street, Raleigh, Wake County, NC 27601.

3. Defendant Leah Moore was employed as a human resources attorney for Defendant Corporation at all times relevant to this Complaint.

## BACKGROUND

4. All actions and omissions alleged herein occurred in Wake County, NC.

5. Plaintiff was employed by Defendant Corporation full time from August 18, 2014, through September 5, 2017, as a Contracts Specialist with significant negotiating authority on behalf of Defendant Corporation.

6. Defendant Corporation is in the business of selling open source subscription software and related services to other businesses.

7. Plaintiff's role was situated in Defendant Corporation's Commercial Legal Group.

8. Plaintiff reported to Mr. Ed Hussey, Commercial Counsel.

9. Mr. Hussey reported to Mr. Winston Lloyd, Americas Regional Counsel.

10. Mr. Lloyd reported to Mr. Edward Rockwell, who was the head of the Commercial Legal Group.

11. The Commercial Legal Group consisted of approximately thirteen attorneys and contracts specialists who managed and negotiated Defendant Corporation's revenue producing contracts.

12. Mr. Rockwell reported to Mr. Michael Cunningham, who was the General Counsel of Defendant Corporation.

13. At the time Plaintiff was hired into her role with Defendant Corporation, she had approximately three years of experience reviewing, drafting, approving, and negotiating contracts in an in-house corporate legal department. She had a total of approximately eight years of paralegal experience.

14. Plaintiff has been a North Carolina State Bar Board Certified Paralegal since June of 2008.

15. Plaintiff was at all times relevant to this Complaint fully qualified to perform her job duties for Defendant Corporation.

16. Plaintiff performed her duties in an excellent manner at all times during her employment with Defendant Corporation.

17. Plaintiff received positive performance reviews throughout the duration of her employment with Defendant Corporation.

18. Plaintiff received many accolades and much praise from Mr. Hussey, Mr. Lloyd, and other attorneys, contracts specialists, and internal clients that she worked with throughout the duration of her employment with Defendant Corporation.

19. Plaintiff committed no misconduct or policy violations throughout the duration of her employment with Defendant Corporation.

20. Plaintiff often stayed late and worked overtime in order to assist in the closing of contractual transactions even when she was not required to do so.

21. Plaintiff routinely volunteered to cover for other contracts specialists who were taking time off from work.

22. Plaintiff successfully closed millions upon millions of dollars worth of sales contracts for Defendant Corporation.

23. Plaintiff's total compensation from Defendant Corporation, including salary and bonuses, exceeded $80,000 annually at the time her employment ended.

24. Plaintiff enjoyed her job and had no intention of ever resigning from Defendant Corporation prior to reaching retirement age.

25. Mr. Hussey and Mr. Lloyd were aware throughout most of Plaintiff's employment at Defendant Corporation that Plaintiff suffered from "depression and anxiety" and that she was a rape survivor.

26. On May 30, 2017, Plaintiff requested from Red Hat's human resources department a reasonable accommodation pursuant to the Americans with Disabilities Act and the North Carolina Persons with Disabilities Protection Act due to her depression and suspected autism spectrum disorder.

27. Plaintiff has a diagnosis of Major Depressive Disorder with Psychotic Features.

28. Emotion dysregulation is a component of Plaintiff's Major Depressive Disorder and has been particularly disabling for her throughout her adult life.

29. Emotion dysregulation pertains to the inability to modulate emotional responses and can result in tendencies to self-harm and suicidal ideations as well as other impulsive behaviors. It can also result in overreactions and underreactions to emotional stimuli that may easily be misinterpreted by others as intentionally inappropriate behaviors. A person with emotion dysregulation may experience physiological distress on a scale much greater than that of the general population.

30. Plaintiffs emotion dysregulation has caused her to be unable to initiate or maintain relationships, such that Plaintiff has no close friends (other than family) and has never been in a long term committed relationship, though she raised a son as a single mother.

31. It has negatively affected her family life, causing painful and harmful misunderstandings.

32. It has caused her to experience bouts of severe hopelessness and suicidal ideation, including two suicide attempts.

33. It has caused her to experience bouts of psychosis, including paranoid delusions and delusions of reference.

34. Plaintiff's condition intermittently causes her to either shut down emotionally, so that she cannot effectively communicate, or otherwise, to experience extreme distress that she is compelled to express in unusual or eccentric ways. In either event, the result is an inability to effectively communicate when Plaintiff's emotion dysregulation is triggered to manifest itself in moments of distress or fear.

35. In the general population, normal or abnormal stressors may cause symptoms of physiological distress as well, but the difference for someone with emotional dysregulation is in the amount of time and fortitude that it takes to recover from such distress and to meet social expectations despite one's subjective experience of the stressor.

36. Plaintiff's condition, if left untreated, causes an inability to think clearly and concentrate, to care for herself properly, and to maintain hygiene.

37. Plaintiff has taken medication for her condition for fifteen years. Prior to treatment with medication, Plaintiff was prone to debilitating paranoid delusions and delusions of reference.

38. After requesting an accommodation, Plaintiff had several meetings with the human resources department at Defendant Corporation over a period of weeks, during which she explained in detail her disability, how her disability affected her interactions with others at work, and why she needed an accommodation.

39. Specifically, Plaintiff reported that she was then-currently having difficulty communicating with her direct supervisor, Mr. Hussey, due to her emotion dysregulation.

40. Plaintiff informed the human resources department that she wanted to be able to communicate with Mr. Hussey because he was her manager and because it was important for her to be able to discuss her work and job performance with Mr. Hussey.

41. Plaintiff also informed the human resources department that her employment with Defendant Corporation was her "dream job," and that she wanted to continue working and succeeding in her area of expertise at Defendant Corporation.

42. Plaintiff also informed the human resources department that the conditions underlying her emotion dysregulation were chronic conditions, that she had suffered from these conditions for many years and that she expected that she would continue to struggle with these conditions for many years.

43. In June of 2017, Plaintiff provided written documentation to the human resources department from Plaintiff's medical providers verifying Plaintiff's disability of Major Depressive Disorder and how it impacted Plaintiff and her job, including how her emotion dysregulation caused Plaintiff to be unable to effectively communicate with others and even to become paranoid or delusional.

44. Plaintiff's medical provider recommended in writing to Defendant Corporation a reasonable accommodation that would allow Plaintiff to engage in mediation with a Red Hat employee she was having difficulty communicating with due to her emotion dysregulation, using a third-party mediator.

45. Additionally, Plaintiff's medical provider recommended that Plaintiff not be required to personally interact with the person that she was having difficulty communicating with, until such time as she was allowed an opportunity to reconcile with such person via the mediation process.

46. In June of 2017, a human resources representative communicated to Plaintiff that Defendant Corporation would provide the reasonable accommodation as recommended by Plaintiff's medical provider.

47. Plaintiff immediately requested that a mediation be set up with Mr. Hussey.

48. The human resources department never responded to Plaintiff's request nor did they set up any mediation.

49. Approximately six weeks passed without any additional feedback from the human resources department. Plaintiff finally heard back from the human resources department in August of 2017, but at that time human resources indicated that they needed additional information from Plaintiff's therapist about what the mediation was "supposed to look like."

50. The human resources department never offered Plaintiff any alternative accommodation.

51. In early August of 2017, Mr. Lloyd removed Plaintiff as the lead negotiator on a major contract with a strategic customer.

52. Plaintiff had previously lead negotiations and successfully closed many major contracts with strategic customers.

53. Plaintiff had never been involuntarily removed from or replaced in a contract negotiation prior to this incident.

54. Said contract was approximately 95% resolved due to Plaintiff's efforts at the time Plaintiff was removed as the lead negotiator.

55. Plaintiff reported to the human resources department that she was concerned that said removal was in retaliation for requesting a reasonable accommodation.

56. Mr. Lloyd was aware of Plaintiff's communication difficulties with regards to Mr. Hussey, and he also knew that Plaintiff had requested a reasonable accommodation from the human resources department to assist with such difficulties.

57. Despite his awareness of Plaintiff's concerns regarding Mr. Hussey, Mr. Lloyd directed Mr. Hussey to be the lead negotiator on the aforementioned contract.

58. On or about August 9th, 2017, Plaintiff sent an email to Mr. Lloyd requesting that he not require her to assist Mr. Hussey in the negotiations given her recent concerns regarding Mr. Hussey, which had not yet been resolved through mediation.

59. Plaintiff also mentioned in said email that she was trusting the human resources department to effect a resolution to her concerns rather than taking her concerns directly to the Equal Employment Opportunity Commission ("EEOC").

60. Said email from Plaintiff was in no way disrespectful of or insubordinate to Mr. Lloyd.

61. A few minutes after said email was sent, Mr. Lloyd asked to speak with Plaintiff in a private office. Plaintiff assumed that he wanted to speak with her about the negotiation she had been working on. Instead, once he and Plaintiff were in a confined space, Mr. Lloyd began to verbally berate Plaintiff, stating he did not care about Plaintiff's "discomfort" with Mr. Hussey.

62. Mr. Lloyd refused to allow Plaintiff to respond to Mr. Lloyd's assertions, intentionally interrupting her every time she tried to speak.

63. Mr. Lloyd then began yelling at Plaintiff saying he did not "appreciate being threatened" by Plaintiff.

64. Plaintiff understood his comments to pertain to Plaintiff's reference to the EEOC in her aforementioned email to Mr. Lloyd.

65. Plaintiff became severely distressed at being yelled at by Mr. Lloyd, and began experiencing physical, emotional, and psychological symptoms of her emotion dysregulation that were so severe Plaintiff had to take sick leave and was unable to return to work for several days.

66. On August 9, 2017, as a result of Mr. Lloyd's treatment of her and the fact that the human resources department had failed to provide a reasonable accommodation as requested, Plaintiff filed a Charge with the EEOC alleging that Defendant Corporation discriminated against her on the basis of disability by refusing to provide a reasonable accommodation within a reasonable amount of time and then retaliating against her with regards to contract assignments.

67. Plaintiff promptly emailed the human resources department of the incident with Mr. Lloyd as well as the fact that she made a report to the EEOC.

68. On August 15, 2017, six days after Plaintiff filed the EEOC Charge, Defendant Leah Moore approached Plaintiff's cubicle with a security guard and told Plaintiff she was being escorted off the premises.

69. After Plaintiff left the premises, Defendant Leah Moore emailed Plaintiff, telling her that she was being placed on an involuntary leave of absence for approximately four weeks.

70. Defendant Leah Moore told Plaintiff that she should focus on her health during her leave of absence.

71. Plaintiff asked Defendant Leah Moore several times if Plaintiff was going to be fired, but Defendant Leah Moore refused to confirm or deny, telling Plaintiff that it was undecided.

72. Defendant Leah Moore told Plaintiff not to contact anyone at Defendant Corporation while on leave and terminated Plaintiff's access to Plaintiff's work emails.

73. Upon information and belief, Defendant Leah Moore sent an email to Mr. Cunningham, in which she recommended terminating Plaintiff because of her disabling medical conditions.

74. Defendant Leah Moore sent an email to Mr. Rockwell, in which she recommended terminating Plaintiff because of her disabling medical conditions.

75. Additionally, Leah Moore stated specifically in said email to Mr. Rockwell that Leah Moore did not believe Defendant Corporation was required pursuant to law to provide a reasonable accommodation for Plaintiff's claimed disability, stating additionally that she did not know whether Plaintiff actually had a disability, even though Plaintiff had spent hours providing information about her impairments to the human resources department, including written documentation from her providers.

76. Further, Defendant Leah Moore made defamatory and false statements about Plaintiff in said email to Mr. Rockwell, by which she sought to justify and create a pretext for the unlawful and unethical firing of Plaintiff.

77. Upon information and belief, Mr. Rockwell and Mr. Cunningham acquiesced to the recommendation from Defendant Leah Moore to terminate Plaintiff and were the primary decisionmakers with regards to Plaintiff's termination.

78. On September 5th, 2017, the day Plaintiff's leave of absence ended, Defendant Leah Moore informed Plaintiff that she was fired from Defendant Corporation.

79. Plaintiff was told by Defendant Corporation through its attorney, Mr. Randy Avram, during post-employment negotiations, that she was fired because her disability disqualified her from her job at Defendant Corporation.

80. Plaintiff suffered severe emotional distress, public humiliation, damage to her professional and personal reputation, loss of income and benefits, social isolation, and other financial and non-financial harm because of the Defendants' actions.

81. As of the date of this Complaint, Plaintiff has been unable to secure another position of employment.

82. On March 7, 2018, the EEOC issued to Plaintiff a Notice of her Rights to Sue under the ADA. Plaintiff received such Notice in the mail on or about March 10, 2018.

## CAUSE OF ACTION: FAILURE TO ACCOMMODATE UNDER THE AMERICANS WITH DISABILITIES ACT

83. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

84. Plaintiff's diagnosis of Major Depressive Disorder and its component of emotion dysregulation is a disability under the ADA in that it is a physical or mental impairment that substantially limits one or more major life activities.

85. Plaintiff's impairment substantially limits her social relationships, her ability to effectively communicate, her ability to meet social expectations, and her ability to think and concentrate when she is distressed.

86. Plaintiff is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that she held at Defendant Corporation, including the review, drafting, approval, and negotiation of high value and strategic contracts and other ancillary duties and projects that might be occasionally required of her.

87. There were absolutely no instances during her employment with Defendant Corporation in which her job performance was negatively critiqued by her manager. Mr. Hussey had nothing but praise and positive things to say about Plaintiff at her performance reviews and otherwise.

88. Defendant Corporation is a global company with thousands of employees; and therefore, it is a covered entity under the ADA.

89. Defendant Corporation was well aware of Plaintiff's limitations, because Plaintiff informed Defendant Corporation on multiple occasions of her mental conditions, and, after requesting a reasonable accommodation, provided detailed and written documentation verifying such information.

90. Defendant Corporation failed to provide a reasonable accommodation to Plaintiff for more than three months after Plaintiff requested one.

91. Defendant Corporation's Failure to Accommodate Plaintiff resulted in continuing communication difficulties for Plaintiff and ultimately the complete breakdown of communications between Plaintiff and her direct supervisor, Mr. Hussey. Such communication was an expected part of her work relationship with Mr. Hussey, and the lack thereof deprived Plaintiff of beneficial feedback and important

information from Mr. Hussey as well as the opportunity to provide her own feedback about her work to Mr. Hussey. Plaintiff relied on support from Mr. Hussey not only in the performance of her job, but in obtaining recognition and opportunities for growth and promotion within the Defendant Corporation.

92. An accommodation of a mediation process as recommended by Plaintiff's medical provider, would have facilitated communication between Plaintiff and Mr. Hussey.

93. Such mediation process was a reasonable accommodation in that it was virtually cost-free and simple to manage, and Defendant Corporation had the means, including the staffing resources, to provide such accommodation without incurring undue hardship.

94. Plaintiff's aforesaid condition, including her emotion dysregulation, did not adversely affect her ability to do her job at any time during her employment, except for the several days of sick leave she took after the incident in which Mr. Lloyd berated and yelled at her, which occurred more than two months after she had requested a reasonable accommodation, and even then, she was able to take care of her most urgent work matter from home.

## CAUSE OF ACTION: DISPARATE TREATMENT UNDER THE AMERICANS WITH DISABILITIES ACT

95. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

96. As set forth above, Defendant Corporation removed Plaintiff from an assigned contract after she requested a reasonable accommodation and provided detailed information about her medical conditions to Defendant Corporation. Such action was adverse in that it deprived Plaintiff of the opportunity to work on a high-profile contract that was important, not only to the sales organization, but for Plaintiff's professional reputation and her efforts to procure a promotion.

97. As set forth above, Defendants forced Plaintiff onto a leave of absence for four weeks. Such action was adverse in that it deprived Plaintiff of the right to continue working on and finalizing contracts that were important, not only to the sales organization, but for Plaintiff's professional reputation.

98. Such forced leave of absence was also an adverse action because it resulted in the loss of Plaintiff's expected

bonus, which is based on individual and team targets met during the preceding quarter. Such bonus is typically calculated shortly after the end of each quarter. Plaintiff was typically awarded a bonus ranging from $800 to $1500 for her work during each individual quarter and had never failed to receive one during her employment with Defendant Corporation; however, since she was not allowed to work through the end of August, she received no bonus pay out for the fiscal quarter ending August 31, 2017.

99. As set forth above, Defendants admittedly took an adverse action against Plaintiff by firing her because of her disabling medical condition.

100. By subjecting Plaintiff to the aforesaid adverse actions, Defendants subjected Plaintiff to treatment that was less favorable than that of her co-workers in the Commercial Legal Group who do not suffer from emotion dysregulation, and who upon information and belief, replaced Plaintiff in her role at Defendant Corporation.

101. The aforesaid adverse actions resulted in specific damages, including devastating financial and emotional harm to Plaintiff as set forth above.

## CAUSE OF ACTION: RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT

102. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

103. Plaintiff engaged in protected activity by requesting a reasonable accommodation under the ADA and by subsequently filing an EEOC Charge when Defendant Corporation failed to provide such accommodation.

104. The adverse actions, as set forth above, by Defendant Corporation occurred contemporaneously with or after Plaintiff had requested a reasonable accommodation and filed an EEOC Charge.

105. Defendants engaged in said adverse actions precisely because Plaintiff requested a reasonable accommodation and filed an EEOC Charge. Such causal relationship is evidenced by the timing of said events, Mr. Lloyd's response to Plaintiff's reference to the EEOC, and other actions, statements, and admissions of Defendants as set forth herein and to be brought forth at trial. When taken as a whole, Defendants' actions in this matter show a clear pattern of an intent to penalize Plaintiff on account of her disabling

medical conditions rather than to assist her with obtaining a reasonable accommodation.

## CAUSE OF ACTION: LIBEL

106. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

107. Defendant Leah Moore, in the email to Mr. Rockwell recommending termination, stated that "[Plaintiff] has been rude, unprofessional, and aggressive; she has been insubordinate; and she has refused to work with her management chain or the People Team to address either her behavior or even her own requests and demands for workplace changes."

108. While rudeness and professionalism may be matters of opinion, the accusations that Plaintiff was aggressive and insubordinate and refused to work with others are clearly statements of fact. Such statements of fact by Defendant Leah Moore are unequivocally false.

109. The implication of the statement that Plaintiff was aggressive, given the context, is that she was a danger to others. Such an unsupported accusation against a mentally disordered employee is rife with prejudice and stereotypical assumptions. There were no instances of aggression by Plaintiff against anyone during her employment with Defendant Corporation.

110. There were no instances of insubordination by Plaintiff during her employment with Defendant Corporation.

111. Requesting not to interact with someone due to disability cannot reasonably be understood to be the same as a refusal to interact, and there were no statements or instances in which Plaintiff ever indicated that she was refusing to work with others.

112. Additionally, the implication that Plaintiff had been directed to work with human resources, aka the People Team, about her "behavior" is also false. At no time was Plaintiff referred to human resources for disciplinary purposes.

113. It is also false that she refused to work with human resources about her request for a reasonable accommodation. Plaintiff responded to every request and question that was presented to her during the interactive process. Indeed, it was human resources who consistently delayed their responses to Plaintiff's request and ultimately failed to provide an

accommodation, citing their wrongful belief that they were not legally obligated to accommodate her.

114. Such false statements of fact by Defendant Leah Moore pertained to Plaintiff, and specifically to Plaintiff's professional and work ethics.

115. Defendant Leah Moore knew or should have known such statements of fact were false, or otherwise, she was recklessly indifferent to the truth or falsity of such statements of fact.

116. Defendant Leah Moore published such false statements in an e-mail to Mr. Rockwell, with whom Plaintiff had a working relationship. Plaintiffs working relationship with Mr. Rockwell had always been congenial and positive. Mr. Rockwell had even been somewhat protective of Plaintiff in dissuading her internal clients from making unreasonable demands of her. Upon information and belief, Mr. Rockwell was aware that Plaintiff's job performance was consistently optimal. Upon information and belief, Mr. Rockwell was ultimately persuaded by Defendant Leah Moore's false statements to agree to Plaintiff's termination from Defendant Corporation.

117. Such false statements of Defendant Leah Moore were obviously defamatory in that they disparaged Plaintiff in the eyes of at least one person in her management chain and were injurious to her professional reputation at Defendant Corporation, to the extent that she was fired from a job that she loved and was exceptionally good at.

## PUNITIVE DAMAGES:

118. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

119. Defendant Corporation demonstrated its bad faith through its intentional delay and ultimate refusal to provide a reasonable accommodation, and its subsequent firing of Plaintiff.

120. The manner in which Defendants engaged with and fired Plaintiff was intentionally malicious, rude, and fraudulent.

121. By telling Plaintiff that she needed to focus on her health, Defendant Leah Moore left Plaintiff with the impression that Defendant Corporation did not want or intend to fire her so long as she took care of her emotional health while on the forced leave of absence.

122. During said leave, Plaintiff went to all of her therapy appointments and continued taking her medications and reading self-help articles, thereby focusing on her health as requested, rather than attempting to find new employment, because she believed she would be allowed to return to work at Defendant Corporation if she tended to her emotional health.

123. To Plaintiff's surprise, Defendant Leah Moore afforded Plaintiff no opportunities to advocate on her own behalf or to show that she was well enough to return to work after the period of leave ended on September 5, 2017.

124. Had Defendants honestly informed Plaintiff that she would not be allowed to return to work after her forced leave of absence, Plaintiff would have immediately started looking for work while she was still theoretically employed instead of expecting to return to work at Defendant Corporation. Additionally, she could have resigned prior to her last day to avoid having to tell prospective employers that she had been fired from her last job.

125. There is no business or legal reason that Defendant Corporation could not have informed Plaintiff that she needed to be looking for a new job while she was on leave.

126. After her termination on September 5, 2017, Plaintiff was contacted by Defendant Corporation's outside employment counsel, Randy Avram, and offered three to six months of severance pay if she would sign a severance agreement.

127. Plaintiff needed the severance pay, and retained attorney Nick Sanservino, Jr. to negotiate her severance package.

128. The severance agreement proposed by Defendant Corporation included unilateral non-disclosure and non-disparagement provisions in favor of Defendant Corporation.

129. Weeks into the negotiations, Mr. Avram made it abundantly clear via his conversations with Plaintiff's attorney and in emails to Plaintiff that Defendant Corporation was using the possibility of severance to coerce Plaintiff to withdraw her EEOC Charge in violation of federal law and EEOC guidance.

130. Plaintiff informed Mr. Avram that Defendant Corporation could not legally make her severance pay contingent on her withdrawal of the EEOC Charge, and she emailed him the website link to the EEOC guidance regarding severance agreements at https://www.eeoc.gov/policy/docs/qanda_severance-agreements.html.

131. Still, once Plaintiff made it clear to Mr. Avram that she would not be filing a withdrawal of the EEOC Charge, the offer of severance pay was withdrawn.

132. Mr. Avram also engaged in rude and condescending communications to Plaintiff by telling her via telephone that she had nothing of value to offer Defendant Corporation and that she knew nothing about the law.

133. Defendant Corporation's actions in unlawfully attempting to coerce Plaintiff to withdraw her EEOC Charge in exchange for severance pay demonstrate its bad faith, oppression, and the willful and wanton nature of its conduct.

134. Additionally, the Defendants' disrespectful and rude emails and communications to and about Plaintiff ignored and undermined her legal and moral rights to be treated like other Red Hat employees despite her disability and were completely bereft of any concern for her mental health or for her financial well-being; and

135. Based on the verbal comments that have been made to Plaintiff by Defendants and their agents, Defendants seek to remain in denial of their own harmful, tortious, and illegal actions against Plaintiff and seem to think they should be able to pay for Plaintiff's silence with a relatively small amount of money rather than being accountable for their wrongful actions and acknowledging the severe and unjust nature of their actions and the harm they caused Plaintiff.

136. Plaintiff never had any ill intent towards the Defendants. She simply wanted to ensure that she would receive the support she needed and was legally and morally entitled to in order to continue to succeed in her career at Defendant Corporation.

137. Litigation was the last thing Plaintiff wanted or expected. Defendants with their persistent hostility towards her and unreasonable proposals for resolution left Plaintiff with no other choice but to pursue her legal remedies in Court.

**WHEREFORE,** Plaintiff prays the Court that:

1. Plaintiff have and recover from Defendants compensatory damages in the amount of $300,000;

2. Plaintiff have and recover from Defendants punitive damages in the amount of $2,000,000;

3. That Defendant Corporation be ordered to reinstate her employment in a similar role with the same or greater salary;

4. That the cost of this action, including reasonable attorneys' fees, be taxed to the Defendants;

5. That all issues be submitted for trial to a jury;

6. Such other and further relief as to the Court may seem just and proper.

Dated this 6th day of June, 2018

Wendy M Dale, *pro se*
3030 Jehossee Street
Apt 105
Raleigh, NC 27616
(336) 290-4476
wemarl28@yahoo.com